## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| CHRISTINE MARIANO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 2:17-cv-301-GZS |
| | ) | |
| RITE AID OF MAINE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PENDING MOTIONS

Before the Court are Defendant's Motion for Summary Judgment (ECF No. 35), Plaintiff's Motion to Amend Complaint (ECF No. 52), and the Unopposed Amended Motion to Allow Oral Argument on Summary Judgment (ECF No. 53). As to the request for oral argument, the Court has determined, in an exercise of its discretion, that the pending motions can be decided without oral argument. Therefore, this request is DENIED. For reasons explained herein, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment (ECF No. 35) and DENIES Plaintiff's Motion to Amend Complaint (ECF No. 52).

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is

one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

## II.  FACTUAL BACKGROUND

 Having reviewed the record and the statements of material fact in accordance with Local Rule 56, "the Court constructs the following narrative from the undisputed facts as well as the disputed material facts viewed in the light most favorable to the non-movant," here, Plaintiff. Ramsdell v. Huhtamaki, Inc., 992 F. Supp. 2d 1, 5 (D. Me. 2014).

### Defendant Rite Aid of Maine, Inc.

Rite Aid Of Maine, Inc. ("Rite Aid") is a drug store chain engaged in the business of providing pharmacy services.  Rite Aid's advertised mission is: "To be a successful chain of friendly, neighborhood drugstores. Our knowledgeable, caring associates work together to provide a superior pharmacy experience and offer everyday products and services that help our valued customers lead healthier, happier lives."  (Joint Statement (ECF No. 32), PageID # 288.)  In general, Rite Aid staffs each pharmacy with one or more pharmacists who are supported by a team of pharmacy technicians.  Rite Aid also employs Pharmacy District Managers ("PDMs") to provide another level of management for its stores.  Each PDM manages a district that contains approximately twenty-five stores and approximately fifty to sixty pharmacists working in those stores.

Rite Aid has adopted a Nondiscrimination Policy and a Harassment in the Workplace Policy, both of which are contained in the Rite Aid Associate Handbook (ECF No. 38-1).[1]  The Rite Aid Associate Handbook also contains procedures to report discrimination or harassment, a policy prohibiting retaliation against employees that utilize these reporting procedures, and a

---

[1] Plaintiff Christine Mariano received a copy of the Handbook in 2007 and last acknowledged receipt of Rite Aid's Associate Handbook on May 10, 2013.

policy for accommodating associates with disabilities.  Additionally, the Handbook contains Rite

Aid's Family and Medical Leave ("FMLA") Policy and a Non-FMLA Medical Leave Policy,

which includes leave as an accommodation under the ADA.[2]  Rite Aid's FMLA Policy generally

provides up to twelve weeks of unpaid FMLA leave for eligible associates with qualifying family

and/or medical needs.  The policy also notes that an "associate may be eligible for additional leave

beyond the FMLA . . . as a reasonable accommodation."  (Rite Aid Family & Medical Leave Policy

(ECF No. 44-4), PageID # 1194.)

Generally, requests for leave and accommodations are handled by the Rite Aid Benefits

Service Center ("RABSC"), whereas Rite Aid's short and long term disability benefits are

administered by Prudential Insurance Company.  When RABSC has "enough information" to

determine leave is being taken for a "FMLA-qualifying reason," the policy states that the associate

must be notified that her leave is designated and counted as FMLA leave within five business days.

(Rite Aid Family & Medical Leave Policy (ECF No. 44-4),  PageID # 1195.)  The Handbook

explains that non-FMLA medical leave requires that a packet of information supporting the leave

request be returned to RABSC "within 15 days" and further indicates that "medical leaves of

absence . . . ordinarily have a cap of 180 days (consecutive or cumulative) in any 365-day period."

(Handbook (ECF No. 38-1), PageID # 1071.)[3]

---

[2] These policies were first effective as of February 2009 and are included in the record as Rite Aid Policy 03.02 (ECF No. 38-2) (Leave of Absence) and Policy 03.03 (ECF No. 38-3) (Family and Medical Leave Act).  A 2012 revision of Rite Aid's FMLA Policy is part of the sealed record in this case (ECF No. 44-4).  To the extent that the leave policies differ, the Court relies on the more recent, more detailed 2012 version (ECF No. 44-4), which was submitted by Plaintiff without any objection by Defendant.

[3] The Handbook thereafter explains:  "If you are unable to return to work within 180 days of your first missed work day, prior to the 180th day, we will contact you to determine whether there are any reasonable accommodations that would enable you to return to work and/or whether you are eligible for additional leave beyond the 180-day maximum as a reasonable accommodation."  Id.

**Rite Prescription Program**

One of the essential job functions of a Rite Aid Staff Pharmacist is to ensure the accuracy and appropriateness of all filled prescriptions.  During the relevant time period, Rite Aid used a process to monitor its prescriptions—called the Rite Prescription Program—to track whether each pharmacist was fulfilling this function.  The Rite Prescription Program includes (1) quality assurance guidelines to prevent prescription incidents, (2) handling, reporting and auditing of prescription incidents, and (3) a Continuous Quality Improvement (CQI) Process.  The Program states: "It is company policy that all quality related incidents in the pharmacy be reported immediately upon discovery, after the pharmacist has addressed the incident with the patient." (Armiento Decl. (ECF No. 38), PageID # 1042.) The program required that all quality related incidents in Rite Aid's pharmacies (including prescription errors) be reported immediately using Rite Aid's toll-free claims reporting number.  These reports are then tracked and attached to a particular pharmacist via a program known as Net Claims.

Rite Aid has a step-by-step process for disciplining Pharmacists when there are prescription errors.  To the extent a Technician or Cashier working at the pharmacy makes a prescription error, the error is the responsibility of the Pharmacist working at the time.

During the relevant time period, if a Pharmacist incurred three errors[4] in a rolling twelve-month period, the Pharmacist received a verbal warning from the PDM. If a Pharmacist incurred six errors in the same rolling twelve-month period, the Pharmacist received a written counseling from the PDM. If a Pharmacist incurred nine errors in the same rolling twelve-month period, the

---

[4] There appears to be a dispute of fact as to whether the error count included only prescription errors (i.e., dispensing the incorrect medication) or also included HIPAA violations (i.e., improper dissemination of a customer's private information).  Mariano maintains that HIPAA violations were not supposed to be counted as errors for purpose of the Rite Aid error discipline process.  See JR 19-21.

Pharmacist received a final written warning from the PDM. If a Pharmacist incurred an additional error in the same rolling twelve-month period, the Pharmacist's continued employment was subject to review by a Peer Review Committee, which could recommend corrective actions or termination of the pharmacist subject to review.

**Plaintiff Christine Mariano**

Christine Mariano, R. Ph. ("Mariano") completed a five-year program at the Massachusetts College of Pharmacy and graduated with a Bachelor of Science degree in Pharmacy in 1985. She became licensed to practice pharmacy in the State of Maine in November 1985 and has practiced pharmacy since that date. On August 13, 1990, Mariano was hired as a Pharmacist at a store located at 37 Portland Road in Kennebunk, Maine (the "Kennebunk Store" or the "Store"). Rite Aid acquired the Store shortly thereafter.[5] At various times during her Rite Aid career, Mariano worked as a Staff Pharmacist, Pharmacy Manager, and Pharmacy District Manager ("PDM").[6] On or about February 29, 2000, Mariano voluntarily transferred to the Rite Aid store in Biddeford, Maine (the "Biddeford Store"). Thereafter, she worked as a PDM from 2005 until 2007 before transferring back to a Staff Pharmacist position at the Biddeford Store. On or about September 22, 2013, Mariano transferred back to the Kennebunk Store as a Staff Pharmacist.

Throughout her tenure at Rite Aid, Mariano's annual performance evaluations rated her as meeting or exceeding expectations. On or before April 12, 2015, Mariano received an overall "Meets Expectations" performance rating from the Kennebunk Store Pharmacy Manager Christopher Joseph ("Joseph") and her then-PDM Shauna Armiento ("Armiento").[7]

---

[5] Rite Aid uses August 13, 1990 as Mariano's date of hire.

[6] At all relevant times, Mariano was an at-will employee with Rite Aid with no employment contract.

[7] The 2015 Performance Review indicates a review date of April 12, 2015 but also indicates that Joseph and Armiento approved the review on March 30, 2015. (JR 639-646.)

**The Kennebunk Store**

Rite Aid staffed its Kennebunk Store with two assigned Pharmacists.  After Mariano's 2013 transfer, those pharmacists were Mariano and Joseph, who served as Mariano's direct supervisor in his role as the Pharmacy Manager of the Kennebunk Store.  In general, Rite Aid expected these two pharmacists to cover all of the shifts at the Store. [8]  If Mariano was the pharmacist on duty for a particular shift, she was "in charge" for that shift.  However, the Pharmacy Manager retained the authority to hire, fire and formally evaluate pharmacy staff and was also registered as the Pharmacist in Charge (PIC) with the Maine Board of Pharmacy.

As a Staff Pharmacist, Mariano understood that she was responsible for quality assurance during the prescription-filling process for her shifts and she was familiar with Rite Aid's quality assurance guidelines, which contain the prescription-filling requirements for Pharmacists.  In accordance with Rite Aid's policies and the directions she received from her supervisors, Mariano understood that she was required to report prescription errors and violations of the Health Insurance Portability and Accountability Act ("HIPAA") in her role as Staff Pharmacist, and that failure to do so could lead to employment termination.

In 2013, when Mariano transferred back to the Kennebunk Store, the Store was in "red status," which meant it was not in full compliance with Rite Aid's model for practicing pharmacy.  By Spring 2014, Mariano had assisted in bringing the Kennebunk Store into compliance with the necessary metrics for the Store to be in "green status."

In December 2014, Armiento became the PDM responsible for the district that included the Kennebunk Store.  This was a promotion for Armiento, who began working for Rite Aid in

---

[8] Rite Aid also employed "floating" pharmacists that would cover shifts if neither Mariano nor Joseph were available.

2011 immediately after receiving her Pharm.D. degree. [9]   In connection with beginning this position, Armiento attended a month-long training and also received computer-based training on discrimination and harassment.   While working as the PDM for the Kennebunk Store, Armiento interacted with Mariano every two to three weeks.   Within Armiento's first six months as PDM, Mariano reported multiple concerns about management of the Kennebunk Store.   Mariano also made multiple reports of prescription errors and HIPAA violations to her PDM and through Net Claims; in some instances, Mariano's reports tied these errors and violations to work flow and training problems at the Store.   On one occasion in response to a Mariano complaint, Armiento and Mariano jointly provided counseling to a technician in connection with HIPAA violations.

**Mariano's History of Reported Errors**

On November 15, 2011, Rite Aid issued Mariano a written counseling for incurring more than six prescription errors in a rolling twelve-month period.  (JR 190-91.)  On November 14, 2014, Rite Aid issued Mariano a written counseling for incurring eight errors in a rolling twelve-month period.  (JR 192-93.)  At the time Mariano received this written warning from her then-PDM Steve Thibeau, she and Thibeau discussed that one or more of the errors should be removed from Mariano's record, but no removal occurred.

At the very end of January and beginning of February 2015, Mariano and Armiento exchanged emails regarding retraining for HIPAA violations at the Kennebunk Store.  Mariano reiterated her concern that HIPAA violations by store technicians appeared on her employee record and Armentio responded that she would "work diligently on those to get them removed if they [were] not actual prescription filling errors." (JR 597.)

---

[9] Armiento was born in 1985.  (JR 466.)

On February 8, 2015, Mariano was responsible for a prescription error.  On February 17, 2015, Armiento issued Mariano a final written warning for incurring nine errors in a rolling 12-month period.  (JR 194-95.)  Mariano again raised concerns that some of the errors included should not be counted as prescription errors.  On March 30, 2015, Mariano was responsible for another prescription error.  On April 7, 2015, Armiento informed Mariano that this latest error would require a Peer Review meeting.

On April 9, 2015, Mariano attended a meeting with a Peer Review Committee (the "Committee"), which had been triggered by her March 30 prescription error.   The Committee consisted of Garrett Cavanaugh, a Regional Pharmacy Vice President at Rite Aid, Matthew Parsons, a PDM at Rite Aid, and Reginald Thomas, a Senior Human Resources Manager at Rite Aid.  During the meeting with the Committee, in response to questions about what was causing her prescription errors, Mariano raised concerns about: (1) a relaxed style of management by the Pharmacy Manager; (2) the Pharmacy Manager allowing the technicians to write the schedule; (3) the Pharmacy Manager allowing one of the technicians at the Kennebunk Store a better schedule so that he could go work at a methadone clinic; (4) the Pharmacy Manager allowing technicians to arrive late or leave early without consulting with Mariano; (5) the Pharmacy Manager's failure to force a technician who was primarily working as a cashier to be cross-trained on other skills; (6) frequent potential HIPAA violations occurring, some of which Plaintiff was able to prevent; and (7) inadequate technician training.  At the meeting, no Committee member expressed that they were upset with Mariano for raising these issues with the Peer Review Committee.

Ultimately, the Committee did not recommend termination of Mariano's employment.  Rather, the Committee noted that Mariano had demonstrated proven abilities to achieve results and recommended that Armiento place Plaintiff on a 90-day Performance Improvement Plan

("PIP"), during which time Plaintiff could have no additional prescription errors. Armiento relayed this decision to Mariano via a phone call on April 9, 2015. For the most part, the Committee and Armiento agreed with the concerns raised by Mariano during the meeting.

### Events that Occurred After Mariano was Placed on a PIP

On April 13, 2015, Mariano emailed Armiento expressing her concerns about the staffing at the Store on April 12 and 13. In both cases, she noted that pharmacy technicians had departed early and that "the same old nonsense" was creating problems with the operation of the pharmacy. She suggested that the situation was impacting her anxiety level. (JR 603.) On April 15, 2015, Mariano had a routine appointment with her health care provider. During that appointment, Mariano explained her recent symptoms, and told her health care provider that she had been stressed at work because of her meeting with the Peer Review Committee.

In May 2015, in an effort to address some of Mariano's concerns, Armiento met with Joseph to discuss pharmacy practice at the Kennebunk Store. She also required Joseph to review the HIPAA policy with each member of the Store's pharmacy team.

At the beginning of one shift in May 2015, Mariano called Armiento to complain that the pharmacy was "a mess" with a backlog of prescriptions. She also complained about the management of the pharmacy. In response, Mariano recalls Armiento asking her if she was "getting too old for this." (JR 31.)

On May 21, 2015, Mariano received a "Rite Aid Applause!" accolade by the Kennebunk Store Manager that stated: "Great job this week." In emails between Mariano and Armiento dated May 28-29, 2015, Mariano voiced concerns about workflow related to moved equipment and concerns about a delivery driver who had suddenly quit. She noted that although Joseph was out, he apparently was being "filled in" on "all the mayhem" at the Store. (JR 612.) On June 4, 2015,

Mariano again emailed Armiento reporting "a real can of worms" with respect to outstanding amounts owed on billed accounts.  (JR 614.)

On June 4, 2015, Mariano received another "Rite Aid Applause!" accolade from Susan Bragg, the pharmacy "Wellness Ambassador" who stated: "Thank you Christine for guiding and getting the pharmacy through the tough times."  (JR 613.)

On June 9, 2015, Armiento went out of work on maternity leave.  On June 10, 2015, Rite Aid notified the Pharmacy Manager, Mariano's direct supervisor, that Mariano was to receive a "career achievement award" for having 25 years of service with the company as of August 13, 2015. (JR 615.)

On June 18, 2015, Mariano was working at the Kennebunk Store when she recalls learning that a technician would be leaving early.  In her recollection, "the work flow deteriorated quickly." (Mariano Aff. (ECF No. 44-2), PageID # 1181.)   After going to the bathroom, she became immobilized and unable to fill prescriptions safely, her cognitive skills shut down, and she began to vomit and felt as though she was about to pass out.   Another pharmacy employee called Mariano's father to come pick her up at the Store and Mariano left without finishing her shift.  The DPM covering Armiento's maternity leave later told Armiento that Mariano had a "mental break" that required her to leave during her shift.  (JR 486.)  On June 19, Mariano discussed her need to take a medical leave with Matthew Parsons, who was then the covering DPM.  Parsons agreed that a medical leave was a good idea and instructed Mariano on how to apply for medical leave.

**Mariano's Medical Leave**

On June 19, 2015, Mariano contacted the RABSC to request a leave of absence under Rite

Aid's FMLA Policy, for June 22, 2015 through August 1, 2015.  In response to this outreach, Rite

Aid sent Mariano a letter, dated June 19, 2015, that acknowledged a leave of absence request for

the period "beginning on 06/22/2015 . . . until 08/01/2015" and enclosed a Certification of Health

Care Provider form (the "Certification Form") that Mariano was to return by July 7, 2015.  (JR

138-39.)  By June 25, 2015, Mariano's physician returned the completed Certification Form to the

RABSC.  On the form, her physician provided an estimated return to work date of "August 2015."

(JR 165.)   In a letter dated July 14, 2015, RABSC informed Mariano that her "certification form

was missing the expected end date of [her] leave" and asked her to have a new form completed by

her healthcare provider.  (JR 176.)  In a letter dated August 20, 2015, RABSC renewed its request

for a response to its earlier letter and indicated documentation must be received by September 4,

2015.

On September 4, 2015, Mariano's physician faxed an updated Certification Form to

RABSC stating an estimated return to work date of "November 2015." (JR 185.)

Mariano remained out on medical leave when Armiento returned from her maternity leave

in early September 2015.  Upon her return, Armiento began communicating with Algene Bailey,

the Human Resources District Manager ("HRDM") responsible for the Kennebunk Store,

regarding Mariano's leave status.  It was Bailey's responsibility as HRDM to coordinate with the

RABSC.

Via an email dated September 14, 2015, Armiento learned that Mariano's request for a

leave of absence was still pending and that her "RTW [return-to-work] date was 8/2."  The same

email indicated that the reason her leave of absence had not yet been approved was "missing

paperwork" and that "multiple requests for that to be fixed" had been made.  The email also noted that Mariano had been approved for short term disability payments through September 17, 2018. (JR 619.)  Responding to this email on September 16, 2015, Bailey indicated, "Because [Mariano] is pending with her paperwork [we] can do nothing until this is resolved.  She is required to update us (store).  We would certainly want to know those updates as soon as possible.  We cannot replace her until we know what her official status is." (JR 619.)  In a separate email that same day, Bailey indicated that Mariano could be contacted by "her supervisor (or Shauna)" for a progress update and suggested Mariano be asked, "Are you on track to return to work on 9/18?" (JR 618.)  On September 17, Armiento called Mariano to see how she was doing and check-in regarding her return to work.  At the time she placed the call, Armiento's understanding was that Mariano's return-to-work date was September 18, 2015.[10]  However, during the call, Mariano indicated she was still in treatment and seeking to extend her leave.  Mariano indicated she was waiting to receive necessary paperwork and understood that the paperwork had been mailed out on September 10, 2015.  Armiento responded that she would reach out to Bailey to expedite getting Mariano the necessary paperwork.  During the call, Armiento did not give Mariano any indication that her position as a Rite Aid pharmacist was at risk.

In fact, Armiento emailed Bailey the same day and indicated she was "nervous on how to proceed with [Mariano] given her history." (JR 622.)  Bailey and Armiento then spoke via phone at which time Bailey indicated that Mariano could be terminated for her failure to submit her leave paperwork.  On or before September 22, 2018, Armiento made the decision to terminate Mariano. Armiento maintains that the basis for her decision was the report she received from Bailey that

---

[10] Armiento and Bailey specifically were aware that Prudential had approved short term disability benefits for Mariano through September 17, 2015.  (JR 619.)

Mariano had failed to return paperwork to RABSC, despite Rite Aid having sent the paperwork to her seven times.[11]  Armiento testified that had she known that the paperwork had been submitted but lacked a precise return to work date, she "would have extended the leave." (JR 491.)  Mariano is the only pharmacist that Armiento has fired for "lack of paperwork" and Armiento admits she made no attempt to investigate whether other PDMs had ever terminated a pharmacist for the same reason. (Id.)  In fact, Armiento was aware of at least one prior occasion in which an employee had their return-to-work date extended beyond twelve weeks.

Bailey called Mariano on September 23, 2015, and indicated that she needed to turn in certain paperwork and provide an exact return-to-work date.  Bailey then instructed Mariano to call another human resources representative at a particular phone number.  It was during this second phone call that Mariano first learned that Rite Aid had already mailed out a letter terminating her employment as of September 22, 2015.  At the end of this call, Mariano called Bailey per the earlier instructions.  During this call, Bailey confirmed the termination letter had already been mailed and that Mariano might be eligible for reinstatement if there was a pharmacist position open when she was cleared to return to work.  In a September 24th call with the RABSC, Mariano relayed that she understood that she was terminated due to incomplete forms.

Mariano received the termination letter on September 26, 2015.  Notably, RABSC notified Joseph that Mariano's request for FMLA leave was denied on October 2, 2015.  (JR 626.)  Mariano was approximately 53 years old at the time of her termination.  Shortly after Armiento terminated Mariano, she moved a recently licensed pharmacist with a Pharm.D. degree who had been working

---

[11] Mariano disputes that she received seven separate mailings from RABSC.  (Mariano Aff. (ECF No. 44-2), PageID # 1183.)

as a floater into the Staff Pharmacist position at the Kennebunk Store.[12]   Mariano believes her termination caused a set back in her recovery and treatment, and that but for her termination she would have been cleared to return to work in November 2015.  In any event, Mariano's medical providers cleared her to return to work in December 2015.  In a letter to Bailey dated December 21, 2015, Mariano notified Rite Aid that she was cleared to return to work and requested reinstatement to her pharmacist position.  (JR 630.)  On January 23, 2016, Mariano's request for reinstatement was forwarded to Armiento.  Asked if she wanted to reinstate Mariano, Armiento responded, "I do not.  We can talk offline about it." (JR 633.)  Armiento maintains that the reason she declined to reinstate Mariano is that "[s]he didn't always come across as the most friendly individual" and Armiento's understanding was that Rite Aid's new hiring guidelines called for "hiring for friendly."[13]  (JR 512.)   In early 2016, Armiento recalls having an open pharmacist position for roughly six months for which she got no applications.  (JR 512.)

By letter dated February 5, 2016, Mariano reported to Rite Aid that she had retained counsel and requested her personnel file.

In April 2016, Armiento reached out to Mariano to ask if she would be willing to interview for a pharmacist position with Rite Aid.  Mariano responded via an email, dated April 12, 2016, in which she informed Armiento that she had retained an attorney and laid out a list of prerequisites that she would need from Rite Aid before she would consider returning to work for them.  (JR 198.)  Mariano received no response from Armiento to this email.

---

[12] Mariano proffers testimony of another pharmacist, Mary Leisentritt, who recalls having a specific conversation with Armiento in which Armiento relayed a preference for hiring pharmacists with Pharm.D. degrees.  The majority of pharmacists with Pharm.D. degrees are under the age of 40.  See Leisentritt Decl. (ECF No. 44-3), PageID # 1187-88.)  Although Rite Aid disputes the accuracy and admissibility of this testimony, the Court considers the testimony in the context of the present motion in constructing the facts in the light most favorable to Mariano.

[13] Nonetheless, Armiento believes that Mariano is of good moral character, was effective in her position as a Staff Pharmacist, and that Mariano respected and abided by the Rite Aid Code of Ethics.

On April 19, 2016, the Maine Human Rights Commission received Mariano's Charge of Discrimination, which was dated April 15, 2016.  Mariano began working as a clinical pharmacist for Maine Medical Center as of May 16, 2016.[14]

## III.    DISCUSSION

Defendant's Motion seeks summary judgment on all of the claims stated in Plaintiff's First Amended Complaint (ECF No. 15), which include: (1) Age Discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, (2) Failure to Provide Reasonable Accommodation in violation of the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq.*, (3) Age Discrimination in Violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4572, (4) Disability Discrimination and Failure to Reasonably Accommodate in Violation of MHRA, 5 M.R.S.A. § 4572(2), (5) Retaliation in Violation of the Maine Whistleblower Protection Act ("MWPA"), 26 M.R.S.A. § 833(1), based on Mariano's reports of HIPAA violations and unsafe practice conditions; (6) Retaliation in Violation of MWPA, 26 M.R.S.A. § 833(1) based on Mariano's reports of medication dispensing errors; (7) Breach of Contract; (8) Disability Discrimination/Failure to Accommodate/Retaliation in violation of the ADAA resulting in Mariano's termination.   The Court notes that in her response to Defendant's Motion, Plaintiff indicated that she is no longer pressing a claim for Breach of Contract.  (See Pls. Response (ECF No. 44), PageID # 1117.)  As a result, the Court is left to consider whether Plaintiff has any trialworthy claims under the ADA, ADEA, MHRA, or MWPA.

---

[14] Mariano began this position on a per diem basis and became a regular full-time clinical pharmacist in December 2016.  (JR 004-005.)

In general, employment claims alleging discrimination or retaliation are assessed at the summary judgment stage using the familiar McDonnell Douglas burden-shifting framework.[15] This framework requires that Plaintiff first present a "prima facie case" to support her specific claim of discrimination or retaliation.  Once the Court determines that the summary judgment record establishes a prima facie case, the burden shifts to the Defendant "to identify a legitimate reason for the adverse employment action."  Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 350 (1st Cir. 2018).  In the third and final step, "the burden reverts to the plaintiff to show that the proffered reason was not the real reason for the adverse employment action but, rather, was a pretext for retaliation."  Id.

Recognizing that Rite Aid has offered a singular legitimate business reason for Mariano's termination, as required under the second step of McDonnell Douglas and that the evidence regarding pretext also overlaps, the Court first considers the prima facie case as to each of Plaintiff's claims.

### A.  The First Step:  The Prima Facie Case

#### 1.  Disability Discrimination in Violation of ADA (Counts II & VIII)

The Court construes Plaintiff's ADA claims as pleading two different theories of disability discrimination: (1) that her disability caused Defendant to terminate her, and (2) that Defendant failed to reasonably accommodate her disability.[16]  In general, "[t]o withstand summary judgment

---

[15] The possible exception is MWPA claims for which the Law Court has a "Maine-specific retaliation paradigm." Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 351 (1st Cir. 2018).  Recognizing the open question of whether a federal court is nonetheless required to conduct a McDonnell Douglas tripart analysis, rather than the more streamlined analysis announced in Brady v. Cumberland County, 126 A.3d 1145 (Me. 2015), the Court here structures its analysis in accordance with the McDonnell Douglas paradigm.  As the First Circuit has explained, there is no substantive difference between the McDonnell Douglas framework and Brady's Maine-specific retaliation paradigm, rather "[t]he proof is simply arranged in a different way."  Theriault, 890 F.3d at 351.

[16] Count VII also includes a claim that Plaintiff was terminated in retaliation for requesting reasonable accommodations.  The Court analyzes this portion of Count VII with the other retaliation claims.  See infra III.A.4.

on an ADA disability-discrimination claim, [the plaintiff] needs to show the existence of a genuine dispute of material fact as to all three elements of her prima facie case: (1) that she is disabled under the ADA; (2) that she "is qualified to perform the essential functions of [her] job with or without reasonable accommodation"; and (3) that she was discharged or otherwise adversely affected in whole or in part because of [her] disability." Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 126 (1st Cir. 2017) (internal quotations and citations omitted).

While admitting that the record supports a disability finding, Defendant argues that Plaintiff cannot prove she was a qualified individual at the time she was terminated because she was unable to perform the essential functions of the staff pharmacist position. In making this argument, Defendant focuses solely on Plaintiff's ability to perform the essential function of a staff pharmacist in September 2015 without any reasonable accommodation. However, the definition explicitly allows for Plaintiff to be deemed a qualified individual if she can establish that she could perform the essential functions of her job *with* reasonable accommodation.

When, as here, the requested accommodation is leave, it would be illogical to evaluate an employee's ability to perform essential functions only during the leave period. See, e.g., Donelson v. Providence Health & Servs.-Washington, 823 F. Supp. 2d 1179, 1189 (E.D. Wash. 2011) ("[I]f an employee's ability to perform essential job functions were evaluated solely with regard to the period of time during which they were on medical leave, no employee that was forced by disability to take medical leave could *ever* be a 'qualified individual' under the ADA.") Rather, the "qualified individual" inquiry must necessarily look at whether the plaintiff was able to do the essential functions of the position "before and after she returned from medical leave." Id. at 1190. In this case, the record establishes that Mariano was able to perform the essential functions of a staff pharmacist both before June 18, 2015, and after the completion of her medical leave. Thus,

the Court concludes that Plaintiff can be considered a qualified individual to the extent that her requested leave accommodation qualifies as a reasonable accommodation.

"[A] leave of absence or a leave extension can constitute a reasonable accommodation under the ADA 'in some circumstances.'" Echevarría, 856 F.3d at 128 (quoting García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647 (1st Cir. 2000)).  In Echevarría, while acknowledging the "fact-intensive nature of the reasonable-accommodation inquiry," the First Circuit held Plaintiff  "must show . . . that the requested accommodation is facially reasonable" and "effective" to survive summary judgment.  Echevarría, 856 F.3d at 128 (affirming a grant of summary judgment where employee had requested twelve months of leave).  Viewing the record before the Court in the light most favorable to Plaintiff, Mariano has presented evidence that her leave request was effective and facially reasonable.[17]

On the issue of effectiveness, the undisputed evidence is that Mariano was cleared to return to work in December 2015, actually returned to work as a pharmacist after that date, and Rite Aid itself reached out to her to interview for a pharmacist position in April 2016.  Thus, it appears that Mariano was able to resume performing the essential functions of a pharmacist after completing a leave of absence, which totaled no more than twenty-six weeks.  While this post hoc analysis reflects one measure of effectiveness, the Court is mindful that Echevarría instructs that the effectiveness should be examined based on the "the facts available to the decision-maker at the time of the employment decision."  Echevarría, 856 F.3d at 128 (quoting Amadio v. Ford Motor

---

[17] The Court acknowledges that the Seventh Circuit has held that "[a] multimonth leave of absence is beyond the scope of a reasonable accommodation under the ADA."  Severson v. Heartland Woodcraft, Inc., 872 F.3d 476, 479 (7th Cir. 2017), cert. denied, 138 S. Ct. 1441 (2018); see also Byrne v. Avon Prods., Inc., 328 F.3d 379, 381 (7th Cir. 2003). The First Circuit has similarly acknowledged that many courts, including the Seventh Circuit, have held that lengthy requests for leave "are not facially reasonable."  Echevarría, 856 F.3d at 130 (citing Byrne).  However, the Court reads Echevarría as eschewing a categorical rule regarding multimonth leaves of absence as "an unreasonable accommodation in every case."  Id. at 132.

Co., 238 F.3d 919, 928 (7th Cir. 2001)).   Viewed from this vantage, Rite Aid had received information from Mariano's physician on September 4, 2015, indicating that Mariano was diagnosed with "PTSD, anxiety & insomnia," and was expected to need two to three months of counseling services.   At that time, he estimated that her period of incapacity would end in "November 2015."   Additionally, Mariano's healthcare provider had indicated that Mariano, upon return, could "possibly" need a reduced schedule, but was "not expected" to have future episodic flare-ups.  (JR 184-185.)   Additionally, Armiento had heard directly from Mariano that she was still in treatment and seeking additional leave.   Given this information, there was no basis for Rite Aid to conclude in September 2015 that extending Mariano's leave through November 2015 would be an ineffective accommodation.   In short, viewed in the light most favorable to Plaintiff, the record establishes that Mariano's leave accommodation was effective.

On the issue of facial reasonableness, the Court notes that Mariano's period of being unable to work fell within the 180-day cap mentioned in the Handbook.  But see Echevarría, 856 F.3d at 131 (noting that "the theoretical availability of benefits under [an employer]'s policy" does not amount to a showing a facial reasonableness).   At the time that Rite Aid terminated Mariano, the information provided to RABSC sought to extend her leave through "November 2015," which would have amounted to leave of absence totaling somewhere between nineteen weeks and twenty-four weeks.   Rite Aid maintains that the lack of a specific end date made it impossible for them to assess or approve any request for leave as a reasonable accommodation.   However, as the First Circuit has explained:

> Some employees, by the nature of their disability, are unable to provide an absolutely assured time for their return to employment, but that does not necessarily make a request for leave to a particular date indefinite. Each case must be scrutinized on its own facts. An unvarying requirement for definiteness again departs from the need for individual factual evaluation.

Garcia-Ayala, 212 F.3d at 648.  In Echevarría, the First Circuit held that a twelve-month leave request, which had followed a prior five-month approved leave, was facially unreasonable. Echevarría, 856 F.3d at 130.  In so holding, the First Circuit noted that six-month requests had been found to be facially unreasonable by other circuits.  Id.  However, having reviewed each of the six cases cited for this proposition, all are factually distinguishable from the fact pattern presented on this record.  Here, a long-tenured employee was suddenly fired after taking approximately ninety days of leave from an employer that has an express policy of allowing up to 180 days of leave.[18]  Having undertaken an individual factual evaluation of the record presented, the Court cannot conclude that Plaintiff's requested accommodation was facially unreasonable.

Rather, the Court is satisfied that Plaintiff has a trialworthy claim that Rite Aid failed to provide her a reasonable accommodation by extending her leave beyond September 22, 2015.[19]  A factfinder who found Rite Aid's failure to accommodate unreasonable would necessarily be entitled to find that the preponderance of the evidence supports finding Mariano was a qualified

---

[18] By contrast, in Hwang v. Kansas State Univ., 753 F.3d 1159 (10th Cir. 2014), the employer had already provided the plaintiff with "a six-month (paid) leave of absence" in accordance with its sick leave policy and the plaintiff was seeking additional leave beyond what the policy allowed.  Id. at 1161.  In Stallings v. Detroit Pub. Sch., 658 F. App'x 221, 226 (6th Cir. 2016), cert. denied, 137 S. Ct. 648 (2017), the Sixth Circuit held a "four-month leave of absence" was not a reasonable accommodation in part because the employee had, during that time period, filed a contradictory claim for social security benefits asserting a total, ongoing disability.  Id. at 226.  In Epps v. City of Pine Lawn, 353 F.3d 588, 593 (8th Cir. 2003), although the plaintiff apparently argued that a "six-month leave of absence was reasonable," the factual recitation makes clear that the plaintiff police officer had already taken a six-month leave prior to his termination in addition to multiple other leaves and absences, all while employed for a department that had only twenty-two officers.  Id. at 590 & 593 n.5.

[19] Plaintiff mentions alternative failure-to-accommodate theories, including requests for "adequate staffing and/or competent management" in the course of opposing the motion for summary judgment.  Pl. Response (ECF No. 44), PageID # 1145; see also First Am. Compl. (ECF No. 15), PageID # 188.  The Court concludes as a matter of law that the record does not establish that any request Mariano made regarding staffing or management was "sufficiently direct and specific" and "explain[ed] how this accommodation . . . [was] linked to [her] disability."  Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001).  Thus, the Court concludes Defendant is entitled to summary judgment on these alternative failure-to-accommodate theories.

individual who could perform the functions of a staff pharmacist with reasonable accommodation.[20]

Defendant also argues it is entitled to summary judgment on the causation prong of Plaintiff's disability discrimination claims.[21]  Recognizing that there is a genuine factual dispute as to the "but for" cause of Mariano's termination, the Court simply cannot say that no reasonable jury could conclude that Mariano's disability was the but-for cause of her termination.

Therefore, the Court is satisfied that Plaintiff has presented a prima facie case of violation of the ADA under both theories related to her termination.

### 2.   Disability Discrimination in Violation of MHRA (Count IV)

While this Court generally concludes that a MHRA claim for disability discrimination rises or falls with their analogous federal ADA claim, Defendants here have cited the recent Law Court decision in Carnicella v. Mercy Hospital, 168 A.3d 768 (Me. 2017) as controlling the disposition of Plaintiff's claim for disability discrimination under MHRA.  In Carnicella, which was decided less than three months after the First Circuit decision in Echevarría, the Law Court held that a nurse was not a qualified individual with a disability for purposes of MHRA when she did not have medical clearance to return to work at the time of her termination, which occurred after she had spent approximately seven months on medical leave.  In so holding, the Law Court cited one of the defenses contained in 5 M.R.S.A. § 4573-A, which reads in relevant part:

---

[20] However, the Court acknowledges that a factfinder might alternatively conclude that Mariano's requested accommodation would create an undue hardship, an argument Rite Aid has not presented at this stage.

[21] To the extent that Defendant asserts that Armiento "was not aware of" Mariano's disabilities, the Court is satisfied that Plaintiff has trialworthy circumstantial evidence that Armiento was aware of Mariano's leave being associated with a mental disability even absent any direct discussion between Mariano and Armiento regarding the details of her condition and treatment.  (Def. Mot. (ECF No. 35), PageID # 973.)  While Defendant cites Joyce v. Postmaster Gen., U.S. Postal Serv., 846 F. Supp. 2d 268 (D. Me. 2012) in support of this lack-of-awareness argument, Joyce is clearly distinguishable.  Specifically, Joyce presented a summary judgment record in which the plaintiff did "not dispute the Postal Service's assertion that the hiring decision-makers did not know of her disability."  Id. at 289.

> **Physical or mental disability.** This subchapter does not prohibit an employer from discharging . . . an individual with physical or mental disability, or subject an employer to any legal liability resulting from . . . the discharge of an individual with physical or mental disability, if the individual, because of the physical or mental disability, is unable to perform the duties or to perform the duties in a manner that would not endanger the health or safety of the individual or others or is unable to be at, remain at or go to or from the place where the duties of employment are to be performed.

5 M.R.S.A. § 4573-A(1-B).  As the Law Court explained, this provision "renders additional leave an unreasonable accommodation and permitted Mercy to terminate Carnicella without running afoul of the MHRA."  Carnicella, 168 A.3d at 774.  Applying the Law Court's interpretation of 5 M.R.S.A. § 4573-A(1-B) to the facts presented here, the Court concludes that Defendants are entitled to summary judgment on Count IV.

### 3.   Age Discrimination (Counts I & III)[22]

Absent direct evidence of age discrimination,[23] a terminated employee must first establish a prima facie case of age discrimination by showing that (1) "she was at least forty years old at the time of discharge;" (2) "she was qualified for the position" but terminated; (3) "the employer subsequently filled the position."  Cameron v. Idearc Media Corp., 685 F.3d 44, 48 (1st Cir. 2012); see also Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc., 804 F.3d 127, 129–30 (1st Cir. 2015).  Ultimately, "plaintiffs must 'establish that age was the 'but-for' cause of the

---

[22] While Plaintiff brings age discrimination claims under both federal and state law, the Court focuses its analysis on the ADEA recognizing that the same analysis is applicable to her claim for age discrimination claim under the MHRA. See, e.g., Maine Human Rights Comm. v. Sunbury Primary Care, P.A., 770 F. Supp. 2d 370, 388 (D. Me. 2011) (collecting cases).

[23] To the extent Plaintiff argues that she has produced direct evidence of age discrimination, the Court disagrees that the evidence viewed in the light most favorable to Mariano includes statements by Armiento (the decisionmaker) "that directly reflect the alleged animus and bear squarely on the contested employment decision."  Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000).  Rather, Mariano presents the more common, inferential case of age discrimination.  See Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018)  ("[I]n order to avoid having to jettison every case of alleged employment discrimination due to a plaintiff's lack of 'spot-on' evidence, we employ the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to evaluate whether a plaintiff can make out an inferential case of the alleged discrimination.")

employer's adverse action.'" Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446 (1st Cir. 2009) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009)).

On the record presented, Plaintiff has presented the minimal evidence required to establish a prima facie case of age discrimination.[24]  Additionally, although disputed, Plaintiff has proffered two separate incidents in which Armiento allegedly made comments regarding age and preference for hiring younger pharmacists.  In short, the record does not support entry of summary judgment in favor of Defendant on the asserted age discrimination claims.

### 4.  Retaliation (Counts V & VI)

In Count V of the First Amended Complaint, Plaintiff alleges that Defendant violated the MWPA[25] when she was subject to discipline and ultimately terminated after reporting HIPAA violations to her employer.  In Count VI, Plaintiff alleges that Defendant violated the MWPA when she was subjected to discipline and ultimately terminated after reporting medication dispensing errors.  Additionally, the Court construes Count VIII of the First Amended Complaint as alleging that Plaintiff was terminated in retaliation for her request for a reasonable accommodation in the form of additional medical leave.  In order to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected conduct under the applicable statute; (2) she was

---

[24] To the extent that Defendant argues that Mariano cannot satisfy the "qualified" element of her prima facie case citing only Winslow v. County of Aroostook, Docket No. 1:11-cv-162-GZS, 2013 WL 594762 (D. Me. Feb. 15, 2013), the Court finds this undeveloped argument unpersuasive.  See Def. Mot. (ECF No. 35), PageID # 983.  In Winslow, this Court found that a plaintiff who was not cleared to work at the time she interviewed for a new position was a not a qualified person with a disability at the time she was not hired and, therefore, could not state a claim for disability discrimination.  See 2013 WL 594762, at *10-*11. The Court fails to see how this conclusion can be applied to conclude that Mariano's age discrimination must fail on the qualified prong of the prima facie case for age discrimination.

[25] While Plaintiff states her claim under MWPA, 26 M.R.S.A. § 833, "the [M]WPA does not itself provide a judicial remedy, there is no direct cause of action pursuant to the [M]WPA.  However, the MHRA provides a direct cause of action for employees alleging discrimination based on [M]WPA-protected whistleblowing activity. . . ." Fuhrmann v. Staples Office Superstore E., Inc., 58 A.3d 1083, 1090 (Me. 2012) (citations, footnote, and quotation marks omitted).  The Court notes that Defendant has not argued that the defense found in 5 M.R.S.A. § 4573-A would bar Plaintiff's MWPA claim in the same way the Law Court found the defense operates to bar claims based on disability discrimination and failure to accommodate in Carnicella.  See supra III.A.2.

subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct. See Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 94 (1st Cir. 2018); see also Pippin v. Boulevard Motel Corp., 835 F.3d 180, 183 (1st Cir. 2016) (discussing the same elements for MWPA). In seeking summary judgment, Defendants challenge whether Plaintiff engaged in protected activity and the casual connection between any protected activity and Mariano's termination.

### a. Protected Activity

For purposes of an ADA retaliation claim, requesting a reasonable accommodation is protected activity. See, e.g., Murray v. Warren Pumps, LLC, 821 F.3d 77, 87 (1st Cir. 2016.) The Court has already concluded that Plaintiff presents a trialworthy claim that her request to extend her leave in September could be considered a request for reasonable accommodation. Thus, for the same reasons, the Court is satisfied that Plaintiff can satisfy the prima facie element of protected activity for purposes of her retaliation claim under the ADA.

Turning to Plaintiff's claimed whistleblower activity, Defendant argues that Mariano's internal reports and complaints do not rise to the level of protected activity because she did not adequately and in good faith report on violations, but was simply making her reports to fulfill the basic job requirements of a staff pharmacist. The Court disagrees that this is the only interpretation of the record of Mariano's reports regarding HIPAA violations and deviations from the applicable standards of care for pharmacy practice. Rather, a reasonable factfinder could also conclude based on the repeated nature of Mariano's reports and the fact that her complaints went beyond simply logging errors via the Rite Prescription Program that she was in fact trying to "shed light on" and voice "opposition to" these issues. Pippin v. Boulevard Motel Corp., 835 F.3d 180, 183–84 (1st Cir. 2016) ("[A] plaintiff may be deemed to have engaged in activity protected by the MWPA even

if the report of unlawful activity she makes is one her employer required her to make as part of her job duties. The employee need only show that her report was made to shed light on and in opposition to the defendant's potential illegal acts.") (internal citations and quotations omitted). As to Mariano's good faith, a factfinder could reasonably find that Mariano was motivated by a desire to stop dangerous conditions at the Kennebunk Store.  See Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 949 (Me. 2015)("A complaint is made in good faith if the employee's motivation is to stop a dangerous condition.")  In short, the Court is satisfied that at least a portion of Mariano's reports qualify as protected activity under MWPA.  See 27 M.R.S.A. § 833(1)(A) & (E).

### b.  Casual Connection

The First Circuit has held that "temporal proximity between the protected activity and the adverse action is a sufficient showing of causation for the purpose of establishing a plaintiff's prima facie case."  Murray v. Kindred Nursing Centers W. LLC, 789 F.3d 20, 25 (1st Cir. 2015) (finding a prima facie causal connection when reports and termination happened within a three month period).  As to Plaintiff's claim of ADA retaliation, there is a compact time frame between Mariano's request for additional leave,[26] which was made in writing to RABSC on September 4 and orally to Armiento on September 17, and her termination on September 22, 2015.  Thus, Plaintiff readily satisfies the causal connection component of her prima facie case for ADA retaliation.

As to the whistleblower claims, the Court acknowledges that the temporal proximity is more questionable.  First, the record suggests that the last whistleblower complaint that Armiento would have been aware of was made in May 2015.  Additionally, Defendant asserts that Mariano

---

[26] Because Mariano's FMLA Leave would have been exhausted September 11, 2015, the Court assumes that any request for leave beyond that date would have been processed as a claim for leave as an accommodation.

began reporting her concerns to her employer back in September 2013. "To demonstrate a causal link, the plaintiff must show that the protected activity (whistleblowing) was a substantial, even though perhaps not the only, factor motivating the employee's dismissal. Put simply, her protected whistleblowing activity must be a but-for cause of the employer's decision to terminate the employment." Murray, 789 F.3d at 26 (internal citations and quotations omitted). As the Law Court explained in Cormier, "the question of whether an employee has generated a dispute of material fact regarding an employer's motivation or intent is often difficult to assess at the summary judgment stage." Cormier, 129 A.3d at 950. On the record presented, the Court concludes that the casual connection is trialworthy.

To summarize, the Court finds that Plaintiff can satisfy the prima facie case requirements for her claims under ADA, ADEA, and MWPA. As a result, the Court moves on to consider Rite Aid's proffered reason for terminating Plaintiff as of September 22, 2015.

### B. The Second Step:  The Proffered Reason for Plaintiff's Termination

While Plaintiff argues that multiple discriminatory or retaliatory reasons motivated Rite Aid's decision to terminate her employment, Rite Aid maintains that it "terminated Plaintiff's employment because she failed to provide the RABSC with the required documentation supporting her request for FMLA leave." (Def. Mot. (ECF No. 35), PageID # 991.)  Additionally, Defendant proffers Armiento's testimony as offering multiple legitimate business reasons for Mariano's termination.  Specifically, Rite Aid asserts that Armiento decided to terminate Mariano's employment based on her understanding that Mariano had not returned leave paperwork despite seven requests to do so.  Additionally, Mariano had not given Armiento any indication on when she would be able to return to work.  As a result, Armiento was concerned about continuing to

staff the Kennebunk Store with floater pharmacists while the Store remained understaffed with technicians.

Recognizing that Mariano factually disputes some of these assertions, the Court is satisfied nonetheless that this proffered explanation is sufficient to move to the next step of the McDonnell Douglas framework as to all of Plaintiff's various claims.

### C.  The Third Step:  Pretext

"When assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations and perceptions of the decisionmaker;" in this case, Armiento. Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 16 (1st Cir. 2007). It is not enough for Plaintiff to show that Armiento exercised "mistaken judgment;" there must be "evidence [that] would permit the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith." Theriault, 890 F.3d at 353 (quoting Murray v. Kindred Nursing Centers West LLC, 789 F.3d 20, 27 (1st Cir. 2015)).

In Defendant's view, Mariano cannot establish pretext if the record establishes that Armiento honestly "believed that Plaintiff had failed to return the required paperwork to support her request for FMLA leave . . . when she decided to terminate Plaintiff's employment."  (Def. Mot. (ECF No. 35), PageID # 981.)  Assuming for the sake of argument that Defendant's view is correct, the Court fails to see how it can make such a determination at the summary judgment stage.  Rather, such a conclusion can only be reached by reading the entire record in the light most favorable to Armiento and making a credibility determination about the Armiento's testimony, which is proffered by way of deposition transcript and declaration.  While a jury listening to

Armiento's testimony might conclude that Armiento's decision was based on an honest, albeit mistaken, belief that Mariano repeatedly failed to return paperwork, the Court cannot make such a determination on this summary judgment record.

Rather, viewing the record in the light most favorable to Plaintiff, Mariano would offer a different account of her September 17th phone conversation with Armiento and also dispute failing to return seven sets of paperwork. Notably, in her email to Bailey after this phone call, Armiento indicated she was "nervous about how to proceed . . . given her history." A reasonable factfinder might conclude that "history" was a reference to Mariano's disability, age, or history of complaints about store practices.

Additionally, Armiento herself maintains that she was led to believe that Mariano had totally failed to return the necessary leave paperwork. However, Rite Aid's written records do not provide support for such a belief. Armiento asserts that Bailey was the source of her belief that Mariano could be terminated for failing to return paperwork that had been mailed to her seven times. However, Bailey's own email, dated September 16, 2015, indicates that they "can do nothing" regarding Mariano's position while she is "pending with her paperwork." (JR 619.) Beyond her conversation with Bailey, Armiento cannot point to any other people or policy that she consulted when deciding to terminate Mariano for lack of paperwork. Moreover, Mariano was apparently told that she was terminated for "incomplete forms" on September 23, 2015, as compared to repeated failure to return paperwork. For her part, Armiento claims she would not have terminated Mariano for simply submitting paperwork that was incomplete.

While these inconsistences may simply reflect an unfortunate series of miscommunications within Rite Aid's human resources hierarchy, they could also allow a factfinder to conclude that Armiento did not have a good faith belief that Mariano was subject to termination for failure to

return paperwork when she terminated her on September 22, 2015.  See Soto-Feliciano v. Villa Cofresi Hotels, Inc., 779 F.3d 19, 29 (1st Cir. 2015) (concluding that "inconsistencies in the defendants' case [were] sufficient to support an inference of pretext.")  Rather, a factfinder could conclude that other aspects of Mariano's "history," which Armiento would later only discuss "off-line," motivated her termination decision.[27]

Simply put, pretext is a trialworthy issue on the record presented.


### D.  Plaintiff's Motion to Amend (ECF No. 52)

More than two weeks after the summary judgment briefing was complete, Plaintiff filed the pending Motion to Amend the Complaint.  The Proposed Second Amended Complaint (ECF No. 52-2) includes two new claims:  (1) Disability Discrimination Based on Being "Regarded As" Disabled (Second Amended Complaint Count VII) and (2) Disability Discrimination based on Refusal to Hire (Second Amended Complaint Count IX).[28]

This request to amend comes well beyond the November 3, 2017 deadline for amending the pleadings in this case. However, Plaintiff claims that the amendment was prompted by information received after this deadline, namely, the deposition of Shauna Armiento, which was taken on February 13, 2018, and responsive documents Rite Aid produced on February 9, 2018. Notably, the discovery deadline in this case was March 15, 2018.  Thereafter, Defendant outlined its plan to move for summary judgment on all of Plaintiff's claims and filed the Motion for

---

[27] Likewise, in considering pretext, a factfinder might consider relevant Armiento's quick refusal to reinstate Mariano in early 2016 because Mariano was not "friendly" enough to be rehired. (JR 510.)  Notably, Armiento testified that she had an open position with no applicants during this same time period.

[28] To the extent that Plaintiff's Proposed Second Amended Complaint also seeks to add two paragraphs of factual allegations, the Court believes that Plaintiff can seek to introduce that evidence to the extent that it is admissible and relevant to any of the claims that remain in light of the summary judgment ruling without further amendment of the current complaint.  See Proposed Second Am. Compl. (ECF No. 52-2) ¶¶ 37 & 38.  Thus, the Court focuses its analysis solely on the two proposed new claims.

Summary Judgment on May 11, 2018.  The summary judgment briefing was completed on July 2, 2018.

Given the "timing and context" of the Motion to Amend, Plaintiff is required "to show 'substantial and convincing evidence' to justify a belated attempt to amend the complaint."  Steir v. Girl Scouts of the USA, 383 F.3d 7, 11-12 (1st Cir. 2004).  Quite simply, Plaintiff's showing does not meet this high mark.  Certainly, to the extent that the above summary judgment analysis in part relies on Armiento's deposition and the documents Rite Aid produced in advance of this deposition, the Court would agree that this evidence substantially supports some of Plaintiff's existing claims.  However, Plaintiff has not shown that the two additional claims she now seeks to add to this case have the requisite "substantial merit."  Torres-Matos v. St. Lawrence Garment Co., 901 F.2d 1144, 1146 (1st Cir. 1990) (noting "appellants were required to show that these proposed amendments had substantial merit . . . and were supported by substantial and convincing evidence.")  By way of example, the Court notes that the "regarded as" claim Plaintiff seeks to add via her Second Amended Complaint is, as pled, likely futile.  Specifically, the proposed pleading does not "select and identify the major life activity that she will attempt to prove the employer regarded as being substantially limited."  See Ruiz Rivera v. Pfizer Pharmaceuticals, LLC, 521 F.3d 76, 84 (1st Cir. 2008), cert. denied, 555 U.S. 939 (2008).  As to Plaintiff's failure to hire claim, it is not apparent based on the summary judgment record that Mariano was "a qualified individual with a disability" at the time she was reapplying to Rite Aid.  See, e.g., Winslow v. County of Aroostook, Docket No. 1:11-cv-162-GZS, 2013 WL 594762, *11 & n.7 (D. Me. Feb. 15, 2013).

Coupled with these substantive issues, Plaintiff's Motion to Amend fails to provide an adequate explanation for her apparent lack of diligence after her receipt of evidence she considered

significant in February.  Faced with the proposed, belated addition of two claims, Defendant argues that there would need to be a limited re-opening of discovery as well as another round of summary judgment briefing if the amendment were allowed.  As a result, any trial of the remaining claims in this matter would be further delayed.  The Court agrees that these additional steps would cause prejudice to Defendant.  In the end, "protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend."  <u>Steir</u>, 383 F.3d at 12.

Therefore, the Motion to Amend is DENIED.


**IV.      CONCLUSION**

For these reasons, the Court hereby GRANTS IN PART & DENIES IN PART Defendant's Motion for Summary Judgment (ECF No. 35).  The Court GRANTS summary judgment in favor of Defendant on Counts IV & VII of Plaintiff's First Amended Complaint as well as to Count VIII to the extent it claims failure to reasonably accommodate based on requests for staffing changes and other remedial action.  As to all other claims, summary judgment is DENIED.  Likewise, the Motion to Amend is DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 15th day of October, 2018.